**Steven Rizzo**, OSB No. 840853
**Mary D. Skjelset**, OSB No. 075840
Rizzo Mattingly Bosworth PC
1300 SW Sixth Avenue, Ste. 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
srizzo@rizzopc.com
mskjelest@rizzopc.com

**ATTORNEYS FOR THE PLAINTIFFS**

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| J.M., A.S., R.L., | CASE NO. |
| Plaintiffs, | |
| v. | **COMPLAINT AND DEMAND FOR JURY TRIAL** |
| KARLA MAJOR, in her individual capacity; MARCY STENERSON, in her individual capacity, JENNIFER LAIB, in her individual capacity; HEATHER UERLINGS, in her individual capacity; SHERRIE MAHURIN, in her individual capacity; MELISSA MARY MILLER; in her individual capacity; CASEY RAY MILLER, in his individual capacity; THE OREGON DEPARTMENT OF HUMAN SERVICES, a government agency; THE OREGON DEPARTMENT OF ADMINISTRATIVE SERVICES, a government agency; and JANE and JOHN DOES 1-15; in their individual and/or official capacities, | |
| Defendants. | |

Plaintiffs allege that at all times relevant and material:

\* \* \*

## PARTIES

**Plaintiffs**

1.      J.M. is a male child of Native American and Caucasian descent, and enrolled member of an Indian tribe, who resides in Oregon. J.M. is a sibling of A.S.

2.      A.S. is a female child of Native American, Hispanic and Caucasian descent, and enrolled member of an Indian tribe, who resides in Oregon. A.S. is a sibling of J.M.

3.      R.L. is a female child of Native American and Caucasian descent who resides in Oregon.

4.      Under Fed. R. Civ. P. 17, Plaintiffs have filed Petitions to appoint guardians *ad litem* to represent their respective interests in this matter.

**Defendants**

5.      Defendant, Karla Major, was an Oregon Department of Human Services ("DHS") agent, authorized designee, and/or employee, acting in the course of her employment and agency relationships. Major was a DHS certifier of Defendants Melissa Mary Miller and Casey Ray Miller.

6.      Defendant, Marcy Stenerson, was a DHS agent, authorized designee, and/or employee, acting in the course of her employment and agency relationships. Stenerson was a DHS certifier of Defendants Melissa Mary Miller and Casey Ray Miller.

7.      Defendant, Jennifer Laib, was a DHS agent, authorized designee, and/or employee, acting in the course of her employment and agency relationships. Laib was a DHS caseworker for Plaintiffs J.M. and A.S.

8.      Defendant, Heather Uerlings, was a DHS agent, authorized designee, and/or

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

employee, acting in the course of her employment and agency relationships. Uerlings was a DHS caseworker for Plaintiffs J.M. and A.S.

9.     Defendant, Sherrie Mahurin, was a DHS agent, authorized designee, and/or employee, acting in the course of her employment and agency relationships. Mahurin was a DHS caseworker for Plaintiff R.L.

10.     Defendant, Melissa Mary Miller ("Melissa Miller"), was a DHS agent, authorized designee, and/or partner, acting in the course of agency/partnership relationships created by DHS. Melissa Miller was married to Defendant, Casey Ray Miller.

11.     Defendant, Casey Ray Miller ("Casey Miller"), was a DHS agent, authorized designee, and/or partner, acting in the course of agency/employment relationships created by DHS. Casey Miller was married to Melissa Miller.

12.     Defendant, the Oregon Department of Human Services ("DHS"), was the governmental agency responsible for the delivery and administration of state and federal programs and services relating to adoption, child welfare, child protective services, and foster care.

13.     Defendant, the Oregon Department of Administrative Services ("DAS"), is the central administrative agency of Oregon state government which sets and monitors high standards of accountability for state agencies and officials.

14.     Defendants Jane or John Does 1-15 are the DHS caseworkers, caseworker-supervisors, certifiers, certification supervisors, child protective services workers, child protective services supervisors, directors, officers, managers, and/or other agents and entities, that abetted, acquiesced, aided, and/or engaged in the alleged constitutional deprivations, statutory violations and torts. Their true identities and the nature of their involvement remain unknown to Plaintiffs, but will become known as formal discovery progresses.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

15.     In the course of their respective agency, employment, and partnership relationships with DHS, all Defendants including Does acted jointly and severally, and for and on behalf of each other.

* * *

## JURISDICTION

16.     The Court has jurisdiction of this civil action under 28 USC § 1343(a)(1),(3),(4), as this action arises under the Civil Rights Act, 42 USC §§ 1983 and 1988, the Adoption Assistance and Child Welfare Act of 1980 ("AAWCA"), P.L .96-272, 94 Stat. 500, and the Child Abuse Prevention and Treatment Act ("CAPTA"), P.L. 93-247, 88 Stat. 4, and as amended by 98 P.L. 457, 98 Stat. 1749; and, in part, 28 USC §1332. The Court also has jurisdiction under 28 USC §1331, 28 USC §§ 2201(a) and 2202, and supplemental jurisdiction under 28 USC §1367(a).

* * *

## FACTUAL ALLEGATIONS

17.     As *parens patriae*, the State of Oregon ("Oregon") has a duty to protect children from abuse and maltreatment.

18.     When Oregon deems parents unable or unwilling to safely care for their children, the state has the power to involuntarily remove their children and place them into the state-sponsored foster care program.

19.     Under the AACWA, as amended, in consideration for the creation of an approved plan for foster care and adoption assistance ("State plan") Oregon was eligible to receive, and did receive, federal reimbursement for foster care maintenance payments made on behalf of eligible children. *See* 42 USC §671(a); *see also* 42 USC §672(a)(1),(2).

20.     The State plan designated DHS as the state authority responsible to establish and

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

maintain statutory and administrative foster care program standards. *See* 42 USC §671(a)(10); *see also* 42 USC §675(1)(A),(B); 42 USC §675(5).

21.    With respect to removal and foster care placement efforts, the State plan recognized that "the child's health and safety shall be the paramount concern." *See* 42 USC §671(a)(15)(A).

22.    DHS's act of removal and placement of the child into foster care with strangers is often traumatic to the child.

23.    When a child is taken into DHS custody s/he is rendered vulnerable, defenseless, and wholly dependent on DHS to safeguard his/her safety, bodily integrity, and civil rights.

24.    On numerous prior occasions, DHS has been audited by federal and state bodies identifying myriad deficiencies, errors, and omissions relating to the administration and handling of its foster care program. These audits have questioned and been critical of DHS's recruitment, retention, and training of certified foster care providers, its ability to appropriately monitor and supervise certified foster care providers and child safety in the foster care setting, and its organizational culture and lack of accountability.

25.    In response to the audit points, DHS pledged and promised to protect child safety by adopting or creating new and improved data-driven plans, strategies, and visions, and also by reinforcing or revising existing policies, practices, and procedures, that were shown to be unsafe.

26.    On numerous prior occasions, DHS has been sued by individual citizens in federal and state courts alleging deliberate indifference, recklessness, and negligence in connection with the agency's historical failures to properly certify/re-certify its foster care providers, to properly monitor the safety of foster children and timely recognize and act upon signs of child abuse, and to maintain appropriate professional boundaries with its foster care providers, i.e., enmeshment. DHS paid money to resolve many of these claims and compensate

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

the child victims for abuse they suffered in its foster program.

27.     DHS knew and/or had notice that heightened scrutiny of its foster care providers and vigilant supervision of foster children, particularly infants and toddlers, was vital to protect the children from abuse, maltreatment, neglect, physical abuse, sexual abuse, and also fear and emotional distress.

28.     DHS's certification process was designed to ensure that foster children were placed and matched with providers who were emotionally and fiscally stable, properly trained, temperamentally suited, and capable of safely providing specified foster care services.  DHS knew that cognitively challenged, unhealthy, and financially unstable individuals residing in cramped and unsanitary surroundings, who lacked any experience parenting a child and had a history of familial abuse, presented a substantial risk of serious bodily harm to foster children.

29.     Under DHS's foster care rules, a foster care provider was an individual and/or family certified by DHS to operate an approved home or facility in which to provide state-sponsored foster care services.

30.     In approximately September 2011, DHS recruited the Millers to act on behalf of the agency as certified foster care providers for non-relative children.

31.     DHS administrative rules and procedures required all such providers, including the Millers, to possess and demonstrate certain abilities, characteristics and qualifications that directly bear on child safety. These included *inter alia*: (1) sound judgment, responsibility, stability and emotional maturity; (2) physical and mental capacity to safely provide foster care services as supported by the applicant's personal health information; (3) the ability to manage the home and personal affairs; (4) conditions in the home that provide for child safety, health, and well-being; and (5) adequate financial resources to support the operation of the home independent of foster care income.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229 1819 | F: 503.229.0630

32. DHS knew and/or deliberately overlooked that the Millers failed to possess or demonstrate the requisite abilities, characteristics and qualifications to serve as foster care providers.

33. Melissa Miller was raised in a dysfunctional household which DHS had investigated in connection with allegations of sexual abuse and neglect. She had no children of her own and no prior child care experience. She self-mutilated and had made repeated attempts to commit suicide, one of which occurred in 2010. She suffered from severe mental health problems including anxiety, depression and insomnia, and she had bi-polar disorder, post-traumatic stress disorder ("PTSD"), and borderline personality disorder. Melissa Miller was also morbidly obese.

34. Casey Miller had no children of his own and had no prior child care experience. He suffered emotional and mental health problems including anxiety and depression, and he suffered from PTSD. He was cognitively challenged, unable to obtain a driver's license, and worked odd hours at a local gas station along with his father. He consumed alcohol excessively and watched pornography in the home. Casey Miller had a serious anger management problem.

35. DHS knew and/or deliberately overlooked that the Millers failed to possess or demonstrate the ability to maintain adequate financial resources to support the operation of the home independent of foster care income which jeopardized Plaintiffs' health and safety.

36. DHS deliberately overlooked and/or chose to ignore that the Millers had defaulted on payments for myriad health conditions, utilities, and consumer items, that they were sued by debt collectors over the defaults and had declared bankruptcy under U.S.C. Chapter 7, Title 11, and that they argued and fought frequently over money issues.

37. DHS recruited the Millers knowing that they had to rely on foster care payments to meet household expenses which was a dangerous incentive for them to minimize or falsify

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

abuse and maltreatment of foster children to protect their foster care provider income stream.

38.    In approximately September 2011, DHS initiated the required home study to determine that the Millers possessed and demonstrated the ability to operate a foster home and maintain conditions to protect child safety and well-being.

39.    DHS knew and/or overlooked that the Millers' housing arrangements were unsanitary, unsafe, and not even minimally adequate. The Millers were renting an approximately 900-square foot house owned by an apparent relative. It was poorly kept and poorly maintained; the carpet smelled of cat urine and there was evidence of mold. The two bedrooms were small and cramped and had no source of heat.

40.    Nevertheless, on information and belief, DHS issued its Certificate of Approval ("COA") authorizing and licensing them to operate a home ("the Miller home") in Marion County, Oregon, for the purpose of providing non-relative foster care services, which created a special danger to Plaintiffs.

41.    As partners, DHS and the Millers committed to work collaboratively on parental visitation plans, personal care services, and supervision and transition plans. The partnership between DHS and its certified non-relative foster care providers such as the Millers was essential to DHS's ability to effectuate its foster care program under the State plan.

42.    As certified foster care providers, the Millers acquired important statutory and administrative benefits, privileges, and rights.

43.    These included the right to receive compensation for their services, the right to be treated as a valued member of the DHS "team," to request support services and access DHS personnel and service providers 24/7, and to be informed of relevant DHS policies and procedures.

44.    The Millers were eligible to receive property and liability insurance coverage

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

through the Oregon DAS, Risk Management Division, and to purchase medical and dental benefits available to state employees. They had the right to receive notice of revocation or suspension of the COA and request a contested case hearing if necessary.

45.     The Millers were responsible to manage the child's health care needs and participation in state-sponsored dental, medical, and mental health plans, and to be advised regarding child-related health conditions. DHS entrusted the Millers with the child's complete medical and psychological history and reports; they were authorized to consent to the child's medical examinations and tests and trained to document their administration of the child's prescription medications in the form specified by DHS.

46.     The Millers agreed to allow DHS to limit the number of occupants permitted to reside in the Miller home and to obtain DHS's approval prior to offering or providing other child-related services. DHS reserved the right to make unannounced visits and conduct private face-to-face contact with any child in the Miller home.

47.     The Millers were expected to understand the need to avoid the use or threatened use of physical force, threats or intimidation regarding foster children and that they were mandatory reporters.

48.     On information and belief, DHS began confining foster children into the Miller home in approximately September 2011.

49.     DHS confined J.M. (age 2) and A.S. (age 5) into the Miller home in December 2011.

50.     J.M. exhibited unremitting signs of child abuse and maltreatment throughout the duration of his confinement in the Miller home. Beginning within one month of his confinement, J.M. presented with repeated bruises and marks about his face, his ears, head, neck, and shoulders; his armpits and his upper and lower arms; his ribs; both of his hips, thighs and

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

buttocks; and, his upper and lower legs. J.M. repeatedly displayed indicia of having been pinched and scratched, and there were cuts and lacerations along his eyebrows and his ears. J.M.'s hair was falling from his head, or it was being pulled out from his head, and he began to consume food in a compulsive manner.

51.    DHS disregarded numerous reports that were made concerning J.M.'s chronic injuries and behavioral changes, including evidence that the Millers used foul language around the children and called them bad names. DHS accepted Melissa Miller's exculpatory statements that the Millers' use of foul language was only a joke and that J.M. bruised easily and had developed self-harming behaviors. DHS chose to not interview Casey Miller.

52.    A.S. also displayed many signs of child abuse and maltreatment throughout the duration of her confinement in the Miller home. Beginning within one month of her confinement, A.S. had bruising on her arms, hips and upper legs, and marks and scratches on her hands. A.S. began to experience symptoms of urinary dysfunction such as involuntary discharge, urgency to void, and vaginal itching.

53.    A.S. began to deteriorate mentally and emotionally: She became violent and engaged in fits of uncontrollable screaming and throwing things that often occurred upon being returned to the Miller home after parental visitations with her biological mother that were held at DHS facilities, and just before her "naptime" in the Miller home. DHS repeatedly dismissed A.S.'s desperate emotional pleas to be reunited with her biological mother. A.S. expressed suicidal ideation and stated that she wished she were dead.

54.    DHS knew and/or suspected that these signs were associated with child sexual abuse. DHS disregarded numerous reports of A.S.'s condition and behavioral changes and repeatedly chose to accept Melissa Miller's exculpatory statements that, like J.M., A.S. had also somehow developed self-harming behaviors, and that she would over-dry her private parts.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

DHS chose not to interview Casey Miller.

55.    As punishment for A.S.'s trauma-induced behaviors, DHS and the Millers collaborated on a visitation plan in which they agreed to withhold A.S.'s visitations and isolate her from her biological mother, which further devastated the abused child.

56.    On information and belief, in approximately June – July 2013, DHS and the Millers collaborated on their plan to transition A.S. and J.M. to their biological mother on a trial reunification basis. Upon their return to mother, J.M. had bruising on his jaw and neck. DHS was notified that Casey Miller had poked J.M. in the head and had pushed him down, and that he treated toddlers roughly when changing diapers. DHS disregarded this additional report. DHS chose to not interview Casey Miller.

57.    In approximately July – August 2013, DHS visited the Miller home and again observed the worsening lack of cleanliness and numerous safety hazards in violation of DHS rules. The violations included dangling electrical power, cobwebs, mold, rotten walls, peeling paint, overladen shelving which were in danger of tipping over onto the children, stained mattresses, a layer of dust coating the furniture and the pervasive odor of cat urine. Continuing the enmeshment and propping up of the Millers, DHS chose to not suspend or revoke the COA.

58.    In approximately August 2013, DHS again removed J.M. and A.S. from their biological mother and confined the children back into the Miller home, which it knew was abusive, unsanitary, and unsafe.

59.    Fearing for the safety of the children, other family members implored DHS to place A.S. and J.M. with them. DHS simply dismissed these requests.

60.    In approximately mid-September 2013, DHS confined R.L. (age 10 months) and her two older siblings into the Miller home – notwithstanding its knowledge of multiple prior reports concerning abuse and maltreatment of A.S. and J.M. and its knowledge of persistent

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

unsanitary and unsafe conditions.

61.    At that time, R.L. had normal gross motor skills; she could pull herself to stand and was able to cruise along furniture. In the Miller home, however, DHS knew that R.L.'s condition deteriorated rapidly, and it knew and/or suspected that R.L. was being abused.

62.    On or before October 15, 2013, DHS observed that R.L.'s ability to crawl, stand, or walk, was impaired. R.L. was unusually still and oddly quiet and Melissa Miller showed a lack of affection towards R.L. and *vice versa*.

63.    DHS accepted Melissa Miller's exculpatory statements that R.L. was not a very active or affectionate child. DHS failed to promptly assess her condition and left her in the unsanitary and unsafe Miller home. DHS chose not to revoke or suspend the COA. DHS chose not to interview Casey Miller.

64.    On or by October 16, 2013, DHS knew that the unsanitary and unsafe Miller home was also not even minimally adequate for the provision of foster care services to infants and toddlers. The Millers told DHS to get R.L. and her two siblings out of the Miller home, claiming that DHS had overwhelmed them by overfilling the small home with a total of five children. The Millers reiterated the request on October 17, and on October 18, 2013.

65.    DHS failed to promptly remove R.L. or assess her condition, and chose to leave her confined into the unsanitary, unsafe, overfilled, and not even minimally adequate Miller home. DHS chose not to revoke or suspend the COA. DHS chose not to interview Casey Miller.

66.     On the morning of October 20, 2013, R.L. was emergently admitted to the hospital with right upper arm pain and swelling. DHS was present during R.L.'s hospitalization. Melissa Miller told the emergency medical providers and DHS that there was no known injury. She stated that on the evening of October 19, R.L. went to sleep without incident and might have fallen out of the pack n' play device and struck an object.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229 1819 | F: 503.229.0630

67.     However, the clinical examination of R.L. revealed fractures affecting each of her limbs. The ten-month-old child had suffered three acute fractures to her right arm consisting of complete breaks and mild displacement of the ulna and radius and a large spiral/oblique fracture to the humerus. She had suffered fractures to the mid and distal humerus bone in her left arm. In her legs, R.L. had also suffered a compression fracture of her proximal right tibia, and a compression/buckle fractures to the distal left tibia and fibula. The seven (7) fractures were consistent with blunt force trauma and/or a twisting or wrenching motion.

68.     Notwithstanding Melissa Miller's exculpatory "no known injury" statement, the medical providers determined that the fractures were "suspicious for nonaccidental trauma" and highly suggestive of child abuse. Local law enforcement was so notified.

69.     On October 20, 2013, Casey Miller consented to an interview with police detectives. Consistent with the information that had been previously reported to DHS regarding his rough treatment of toddlers, Casey Miller admitted that performing foster care services frustrated him.

70.     DHS also knew that contrary to Melissa Miller's exculpatory "no known injury" statement, Casey Miller confirmed that he had abused and "mishandled" R.L. on several occasions during her month confinement in the Miller home.

71.     Casey Miller (6 ft., 250+ lbs.) admitted that on the evening of October 19, 2013, he yanked on R.L.'s arm and heard a "loud pop." R.L. reacted to the trauma with a "shocked look on her face." Casey Miller described other instances where, struggling to force R.L. into her sleeper as he changed her, he had traumatized R.L. by pushing down on her legs to "straighten" them. He also had "grabbed" R.L.'s wrist apparently to force her to "loosen her grip" on her older sibling's hair.

72.     Casey Miller was placed under arrest for multiple counts of Criminal

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

Mistreatment I, a Class C felony. He was charged with unlawfully and knowingly causing physical injury to R.L. and unlawfully and knowingly withholding necessary and adequate medical attention. Melissa Miller was not charged.

73.     Oregon provides for cross-reporting of child abuse reports and related information between DHS and law enforcement officials. Therefore, DHS received the Casey Miller police reports or had access to them at or shortly following his police interview.

74.     DHS was worried that the fact and severity of R.L.'s injuries implicated its failure to properly certify/re-certify the Millers, its failure to properly monitor child safety in the Miller home and its failure to have timely recognized and acted upon signs of Plaintiffs' abuse. DHS was concerned that its repeated acceptances of Melissa Miller's exculpatory statements and disregard of persistent unsanitary and unsafe conditions implicated its enmeshment with the Millers, i.e., failure to maintain appropriate professional boundaries. DHS also worried that its repeated deliberate failures to interview Casey Miller would evidence its enmeshment with the Millers and its reckless disregard of Plaintiffs' safety in the Miller home.

75.     DHS knew that based on the fact and severity of R.L.'s injuries corroborated by the multiple prior reports concerning Casey Miller's rough treatment of toddlers, it was mandatory to have all of the foster children in the Miller home, including J.M. and A.S., medically evaluated and/or assessed to determine the extent of their abuse and maltreatment. However, DHS was worried that, based on her age, A.S. was a witness to the Millers' abuse and maltreatment of other foster children occurring in the Miller home, including J.M. Consistent with its organizational culture and lack of accountability, DHS chose not to conduct a medical evaluation or child abuse assessment of A.S. and J.M., which created a substantial risk of serious harm to the children.

76.     A division of DHS known as Child Protective Services ("CPS") is ordinarily

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

charged with the investigation of reports of child abuse in collaboration with law enforcement.

77.     However, DHS knew that when a child abuse report involves the conduct of a DHS-certified foster care provider, such as R.L.'s did, the agency's own conduct is at issue, and it also knew and/or was advised that entrusting CPS to investigate the Millers' abuse of R.L. was a conflict of interest.

78.     Consistent with its organizational culture and lack of accountability, DHS failed or refused to acknowledge the conflict, and chose not to refer the R.L. investigation to an independent agency.

79.     Instead, DHS used its authority as the children's legal custodian and its control over R.L.'s child abuse investigation to cover up its conduct and protect itself and the Millers from civil liability, to silence the media, and to avoid more public opprobrium, *inter alia*.

80.     DHS knew that, as the actual victim of violent crimes, R.L. had constitutional and statutory rights to meaningfully participate in the criminal prosecution of Casey Miller. *See* Or Const, Art I, §42. These included the right to be present and informed in advance of any critical stage of the proceedings, the right to be consulted regarding plea negotiations, the right to seek restitution, and the right to be present and to be heard at the time of sentencing.

81.     To silence the media, DHS quickly waived R.L's victim's rights – prior to Casey Miller's initial appearance in the then pending criminal prosecution. At the same time, and also unbeknown to R.L., DHS identified itself as the crime victim in that matter and sought restitution, only for itself.

82.     To mitigate Casey Miller's admissions, DHS tried to blame R.L.'s multiple fractures that were at different stages of healing on brittle bone disease.

83.     To delay Casey Miller's prosecution, DHS contacted the Oregon Health & Sciences University ("OHSU") to evaluate whether R.L.'s multiple fractures were caused by

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

brittle bone disease. Unbeknown to the providers, DHS withheld the Casey Miller police reports and falsely led them to rely on Melissa Miller's exculpatory "no known injury" statements.

84.    Simultaneously, DHS withheld R.L.'s complete medical history from the district attorney, including the fact of her normal development prior to her confinement in the Miller home, the fact of her rapid decline therein, and the incontrovertible diagnoses of traumatic injury.

85.    DHS's pursuit of a brittle bone defense of Casey Miller's admissions was self-serving.

86.    Casey Miller was responsible for breaking seven bones in R.L.'s 10-month old body. DHS was advised that many children with brittle bone disease, i.e., *osteogenesis imperfecta,* have no fracture history in their first year of life. DHS was also advised that even if R.L. had this disease, which she did not, it would only have indicated a predisposition to fracture, not exclude a possibility or, in this instance, the fact of R.L.'s multiple traumatic fractures.

87.    DHS, however, accomplished several months of delay. However, in approximately June 2014, the district attorney contacted OHSU geneticists to inquire into the status of any diagnosis. Upon learning that OHSU did not have the Casey Miller police reports, arrangements were made to provide them. Upon receiving the police reports, OHSU confirmed that R.L. did not have *osteogenesis imperfecta* and notified DHS.

88.    DHS then acquiesced in Casey Miller's light probationary sentence of 36 months with no additional jail time, and the successful completion of an anger management assessment – without advising R.L.'s biological parent(s).

89.    In January 2017, A.S., who DHS had left untreated, disclosed that Casey Miller had repeatedly sexually abused her throughout the duration of her confinement in the Miller

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

home.

90.     On numerous occasions, often at naptime, Casey Miller took A.S. into the bedroom, closed the door and window coverings, and placed the child in bed. He forcibly undressed A.S. and made her watch his pornography with him which excited him. He forced A.S. to act, perform, and make sounds in ways the females in his pornography did and he acted out on A.S. in ways the males did. Casey Miller repeatedly forced A.S. to perform oral sex upon him, and he repeatedly and forcibly engaged in acts of deviate sexual intercourse upon her. After unnaturally gratifying himself with A.S. (in ways too grotesque for pleading purposes) Casey Miller rewarded A.S. by offering her chewing gum or with pocket change he earned from the gas station.

91.     In approximately February 2017, Casey Miller agreed to another interview with local police detectives. He told the detectives that he had physically and sexually abused A.S. on numerous occasions in the Miller home and corroborated her disclosure. DHS had knowledge of this interview.

92.     On September 7, 2017, Casey Miller entered a plea of guilty to multiple counts of Sodomy (I) involving A.S. The court revoked Casey Miller's probation for his crimes against R.L. and imposed a 30-year prison sentence for his crimes against A.S.

93.     Family for J.M., A.S., and R.L., appeared at the September 7 hearing on Casey Miller's sentencing and exercised their victim's rights under Oregon law. DHS did not attend the hearing and it made no effort to console Plaintiffs or their families.

94.     Prior to the filing of this action, Plaintiffs requested their client files and other relevant records from DHS to find out what happened to them in DHS custody. Claiming that it is "data-driven" DHS purported to charge Plaintiffs (child abuse victims) the sum of $10,000 to "gather" only hard-copy documents. Meanwhile, DHS and Does were reviewing and redacting

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

responsive electronically stored information. DHS also used the Oregon public records law to argue with and taunt Plaintiffs, and it delayed providing responsive documents and information.

95.    Plaintiffs served a courtesy tort claim notice to DAS. DAS confirmed receipt thereof and claimed that it had opened an "investigation" into the merits.

96.    Inconsistent with its stated mission to set and monitor high standards of accountability for state agencies and officials, DAS, acting in concert with DHS, failed to complete the sham "investigation" and determine legal responsibility, forcing Plaintiffs to bring this action.

* * *

## CLAIMS FOR RELIEF

### I.    FEDERAL CLAIMS

**FIRST CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights**

**(All Plaintiffs – Defendants Major and Does)**

97.     Plaintiffs incorporate by reference paragraphs 1-93 as though fully realleged.

98.    42 USC §1983 provides in relevant part that every person who under color of any statute, ordinance, regulation, custom, or usage, subjects or causes to be subjected, any citizen of the United States to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity or other proceeding for redress.

99.    Plaintiffs had a right to bodily integrity and caseworker supervision, and the right to safe conditions of confinement and adequate medical care, including protection from cruel and unusual punishment.

100.    As a DHS certifier of the Millers, Defendant Major had a duty to protect Plaintiffs' safety, bodily integrity, and civil rights.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

101.    Between approximately September 2011 – October 2013, Major chose to not thoroughly investigate the Millers prior to certifying them because she knew and/or suspected that they did not possess and demonstrate the requisite abilities and qualifications to serve as foster care providers for infants and toddlers.

102.    Major knew and/or deliberately overlooked that the Millers were not emotionally and fiscally stable, properly trained, temperamentally suited, or otherwise capable of providing safe foster care for Plaintiffs.

103.    Major knew and/or suspected that Melissa Miller had a history of self-mutilation and suicide attempts; severe mental health problems including anxiety, depression and insomnia, bi-polar disorder, PTSD, and borderline personality disorder; no children of her own and no prior parenting experience; and that she was raised in a dysfunctional household and had a juvenile history with DHS.

104.    Major knew and/or suspected that Casey Miller had anger management problems and suffered with emotional and mental health problems including anxiety, depression, and PTSD; cognitively challenged, underemployed and unable to obtain a driver's license; and had no children of his own and no prior parenting experience.

105.    Major knew and/or suspected that the Millers were repeatedly hospitalized, and they incurred significant medical expenses; that their lack of financial capacity had led the Millers into bankruptcy and that following their discharge from bankruptcy they continued to default on financial obligations and were repeatedly sued over their failures to pay household, medical, and personal expenses until they were certified.

106.    Major knew and/or deliberately overlooked that the Millers did not have the ability to maintain adequate financial resources independent of foster care payments and that their reliance on foster care payments to meet household expenses incentivized them to minimize

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

or falsify abuse and maltreatment which increased the risk of harm to Plaintiffs.

107.    Major knew and/or deliberately overlooked that the Millers' approximately 900-square foot, 2-bedroom rental home was poorly kept, and that it was unsanitary, unsafe, and not even minimally adequate.

108.    From approximately December 2011 – September 2013, Major knew and/or suspected that Millers were abusing J.M. Major ignored and/or failed to adequately investigate reports that J.M. repeatedly exhibited multiple bruises and marks over his face and his ears, head, neck, and shoulders, armpits, upper and lower arms, ribs, both hips, thighs and buttocks, and upper and lower legs; bite-marks on his hands, fingers, arms, and evidence of pinching and/or scratch marks, cuts or lacerations along his eyebrows and his ears; and that J.M.'s hair was falling from his head or was being pulled out from his head, and that J.M. began to eat in a compulsive manner.

109.    Major ignored and/or disregarded reports that Casey Miller was rough with toddlers and that he injured J.M. by poking him in the head and pushing him down. Instead, Major chose to accept Melissa Miller's exculpatory statements. She chose not to revoke or suspend the COA, and she chose not to interview Casey Miller whom she knew and/or suspected was unfit.

110.    From approximately January 2012 – September 2013, Major knew and/or suspected that the Millers were abusing A.S. Major ignored and/or disregarded multiple reports that A.S. had marks and scratches on her hands, bruising on her arms, and bruising on her hips and upper legs, abdominal pains, as well as vaginal itching and urinary dysfunction including involuntary discharge and urgency to void, symptoms which Major knew and/or suspected were associated with child sexual abuse.

111.    Major ignored and/or disregarded reports that A.S. deteriorated in the Miller

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

home mentally and emotionally, and that she had become violent and was engaging in uncontrollable screaming and fits that often occurred just before naptime.

112.    Major accepted Melissa Miller's exculpatory statements regarding A.S. She chose not to revoke or suspend the COA, and she chose not to interview Casey Miller whom she knew and/or suspected was unfit.

113.    In August 2013, Major placed and/or acquiesced in the placement of A.S. and J.M. back into the Miller home notwithstanding the history of multiple prior reports regarding abuse and maltreatment of A.S. and J.M and persistent unsanitary conditions and safety hazards in the Miller home, and she disregarded requests made by family members to place the children with them.

114.    In approximately September 2013, Major had overfilled the Miller home with five foster children and placed and/or acquiesced in the placement of R.L. into that home that she knew and/or suspected was abusive, unsanitary and unsafe.

115.    Major chose to not investigate the true cause of R.L.'s rapidly deteriorating condition in the Miller home. Based on R.L.'s condition, Major knew and/or suspected that Melissa Miller's exculpatory statements raised safety concerns, yet she chose not to promptly remove R.L., and revoke or suspend the COA, and she chose not to interview Casey Miller regarding R.L.

116.    Major substantially departed from accepted professional judgment, practice, and standards, and/or acted with deliberate indifference as follows:

a)    Certifying/recertifying, and/or acquiescing in the certification/recertification, of the Millers;

b)    Disregarding the Millers' lack of adequate financial resources independent of foster care payments and their dependency on foster care payments to maintain

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

household expenses;

c)    Failing to maintain appropriate professional boundaries with Millers;

d)    Confining and/or acquiescing in the confinement of J.M. into the Miller home;

e)    Failing to protect J.M.'s safety;

f)    Accepting and/or relying upon Melissa Miller's exculpatory statements regarding J.M.'s condition;

g)    Failing to interview Casey Miller regarding J.M.;

h)    Confining and/or acquiescing in the subsequent confinement of J.M. into the Miller home (summer of 2013);

i)    Confining and/or acquiescing in the confinement of A.S. in the Miller home;

j)    Failing to protect A.S.'s safety;

k)    Ignoring and/or failing to interview A.S. and/or investigate her condition in the Miller home;

l)    Accepting Melissa Miller's exculpatory statements regarding A.S.'s condition;

m)    Failing to interview Casey Miller regarding A.S.;

n)    Withholding A.S.'s parental visitations with her biological mother;

o)    Confining and/or acquiescing in the subsequent confinement of A.S. into the Miller home (summer of 2013);

p)    Confining and/or acquiescing in the confinement of R.L. into the Miller home;

q)    Failing to protect R.L.'s safety;

r)    Ignoring and/or failing to adequately investigate R.L.'s condition;

s)    Accepting and/or deferring to Melissa Miller's exculpatory statements regarding R.L.'s condition;

t)    Failing to timely remove Plaintiffs from the Miller home;

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

u)      Overfilling the Miller home with foster children;

v)      Failing to timely revoke/suspend the COA;

w)      Failing to conduct a medical evaluation or child abuse assessment of J.M. and A.S. following Casey Miller's police interview regarding R.L.

117.    Major's conduct was a proximate cause of Plaintiffs' injury and damage, some or all of which is permanent.

118.    Each Plaintiff suffered non-economic injury and damage including fear, confusion, severe emotional distress and psychological injury, physical injury; disruption of attachment, cognitive and developmental delays, difficulty forming mature and positive personal relationships, loss of self-esteem, lack of trust and suspicion of caregivers, and/or physical impairment and/or disability.

119.    Each Plaintiff seeks non-economic damages as follows:

a)      J.M. seeks non-economic damages in the amount of $2,500,000;

b)      A.S. seeks non-economic damages in the amount of $15,000,000;

c)      R.L. seeks non-economic damages in the amount of $7,500,000;

120.    Each Plaintiff seeks to recover economic damages in amount(s) to be proven at trial.

121.    Each Plaintiff seeks reasonable attorney fees, costs, and disbursements, under 42 USC §1988, and also seeks an award of punitive damages.

**SECOND CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights**

**(All Plaintiffs – Defendants Stenerson and Does)**

122.    Plaintiffs incorporate by reference paragraphs 1 – 93, 97 – 122, as though fully realleged.

123.    As a DHS certifier, Defendant Stenerson had or assumed a duty to protect

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

Plaintiffs' safety.

124.    Beginning on or before July 2013, based on the Millers' certification file, the history of multiple reports regarding abuse and maltreatment of J.M. and A.S. and reports that Casey Miller treated toddlers roughly, Stenerson knew and/or suspected that the Millers were unfit and that J.M. and A.S. were being abused. Stenerson failed to adequately investigate the abuse, failed to protect child safety in the Miller home, and chose not to interview Casey Miller.

125.    Based on her inspection of the Miller home, Stenerson knew and/or should have known that the home was unsanitary, unsafe, and not even minimally adequate. Stenerson nevertheless acquiesced and/or ratified those conditions and failed to protect child safety.

126.    In approximately August 2013, Stenerson participated and/or acquiesced in the subsequent confinement of J.M. and A.S. into the Miller home notwithstanding her knowledge of the multiple prior reports of abuse and maltreatment concerning J.M. and A.S. and her knowledge of unsanitary and unsafe conditions.

127.    In approximately September 2013, Stenerson participated and/or acquiesced in the confinement of R.L. and her siblings into the Miller home notwithstanding her knowledge of the multiple reports of abuse and maltreatment concerning J.M. and A.S., her observations of the unsanitary and unsafe conditions there.

128.    Notwithstanding Melissa Miller's exculpatory statements, Stenerson knew and/or suspected that R.L.'s rapidly deteriorating condition in the Miller home raised concerns of abuse and maltreatment, yet she failed to adequately investigate R.L.'s rapidly deteriorating condition, failed to promptly remove her, failed to promptly revoke or suspend the COA, and she failed to interview Casey Miller.

129.    Stenerson substantially departed from accepted professional judgment, practice, and/or acted with deliberate indifference as follows:

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

a)      Certifying, recertifying, and/or acquiescing in the certification/recertification, of the Millers;

b)      Certifying, recertifying, and/or acquiescing in certification/recertification of the Miller home;

c)      Disregarding the Millers' lack of adequate financial resources independent of foster care payments and their dependency on foster care payments to maintain basic household expenses;

d)      Failing to maintain appropriate professional boundaries with the Millers;

e)      Placing and/or acquiescing in the subsequent confinement of J.M. into the Miller home (summer of 2013);

f)      Failing to protect J.M.'s safety;

g)      Failing to interview Casey Miller regarding J.M.;

h)      Placing and/or acquiescing in the subsequent confinement of A.S. into the Miller home (summer of 2013);

i)      Failing to protect A.S.'s safety;

j)      Failing to interview Casey Miller regarding A.S.;

k)      Confining and/or acquiescing in the confinement of R.L. into the Miller home;

l)      Failing to protect R.L.'s safety;

m)      Failing to adequately investigate R.L.'s deteriorating condition;

n)      Accepting and/or deferring to Melissa Miller's exculpatory statements;

o)      Failing to timely remove R.L.;

p)      Overfilling the Miller home with foster children;

q)      Failing to revoke/suspend the COA;

r)      Failing to conduct a medical evaluation or child abuse assessment of J.M. and

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

A.S. following Casey Miller's police interview regarding R.L.

130.    Stenerson's conduct was a proximate cause of Plaintiffs' injury and damage, some or all of which may be permanent.

### THIRD CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights

### (A.S., J.M. – Defendants Laib and Does)

131.     Plaintiffs A.S. and J.M. incorporate by reference paragraphs 1 – 93, 97 – 129, as though fully realleged.

132.    On information and belief, Defendant Laib was a caseworker for A.S. and J.M. from approximately December 2011 and beyond April 2013. Laib had a duty to protect the safety of A.S. and J.M. in the Miller home.

133.    Laib was required to assess and document the Millers' ability to provide safe care and/or whether the present demands exceeded the Millers' ability to provide such care.

134.    Laib was required to have meaningful face-to-face contacts with A.S. and J.M. in the Miller home, and timely review facts and information pertaining to their ongoing emotional, mental and physical condition.

135.    From approximately January 2012 – September 2013, Laib ignored and/or failed to adequately investigate reports that J.M. repeatedly had excessive, multiple bruises and marks over his face and his ears, head, neck, and shoulders, his armpits and upper and lower arms, his ribs, both hips, his thighs and buttocks, and his upper and lower legs; bite-marks on his hands, fingers, arms, and evidence of pinching and/or scratch marks, cuts or lacerations along his eyebrows and his ears; and that his hair was falling from his head or was being pulled out from his head, and that he began to eat in a compulsive manner. Laib also ignored and/or failed to adequately investigate reports that Casey Miller was rough with toddlers, choosing instead to accept Melissa Miller's exculpatory statements without interviewing Casey Miller.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

136.    From approximately January 2012 – September 2013, Laib ignored and/or failed to adequately investigate reports that A.S. exhibited signs and symptoms that were consistent with abuse and maltreatment including marks and scratches on her hands, bruising on her arms, and bruising on her hips and upper legs that were consistent with abuse, and vaginal itching and urinary dysfunction including involuntary discharge and urgency to void.

137.    Laib also ignored and/or failed to investigate reports that A.S. was deteriorating in the Miller home mentally and emotionally, that she had become violent and was engaging in uncontrollable screaming and fits that often occurred just before naptime, and that A.S. stated she wished she were dead.

138.    Laib knew and/or suspected that A.S.'s deteriorating condition was consistent with abuse and maltreatment, including signs of sexual abuse, yet she repeatedly accepted Melissa Miller's exculpatory statements and encouraged her to under-report child injuries, and she repeatedly failed to interview Casey Miller whom she knew and/or suspected was unfit.

139.    Laib knew and/or suspected that the Miller home was abusive, and that it was unsanitary and unsafe.

140.    Defendants Laib acted with deliberate indifference to A.S. and J.M.'s recognized liberty interests and rights and/or departed substantially from accepted professional judgment, practice or standards in one or more of the following ways:

a)    Failing to protect the safety of J.M.;

b)    Failing to document meaningful face-to-face contact with J.M. in the Miller home;

c)    Ignoring and/or failing to adequately investigate repeated reports of abuse and maltreatment of J.M.;

d)    Failing to interview Casey Miller regarding J.M.;

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

e)      Failing to protect the safety of A.S. in the Miller home;

f)      Failing to document meaningful face-to-face contact with A.S. in the Miller home;

g)      Ignoring and/or failing to adequately investigate reports consistent with abuse and maltreatment of A.S.;

h)      Accepting Melissa Miller's exculpatory statements;

i)      Withholding A.S.'s parental visitations with her biological mother;

j)      Failing to interview Casey Miller regarding A.S.

141.    Laib's conduct was a proximate cause of injury and damage to Plaintiffs J.M. and A.S., some or all of which is permanent.

142.    Laib's conduct constituted deliberate indifference and/or substantial departures from professional judgment, practices or standards.

**FOURTH CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights**

**(A.S., J.M. – Defendants Uerlings and Does)**

143.    Plaintiffs A.S. and J.M. incorporate by reference paragraphs 1 – 93, 97 – 142, as though fully realleged.

144.    On information and belief, Defendant Uerlings was, or was substituting as, the caseworker for J.M. and A.S. beginning in approximately April 2013.

145.    Uerlings had or assumed a duty to protect the safety of J.M. and A.S.

146.    Uerlings had or assumed a duty to review then existing DHS records regarding the Miller home which continued through to the termination of J.M. and A.S.s' wardship.

147.    Uerlings was required to assess and document the Millers' ability to provide safe care and/or whether the present demands exceeded the Millers' ability to provide such care.

148.    Uerlings was required to have meaningful face-to-face contacts with A.S. and

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

J.M. in the Miller home, and timely review facts and information pertaining to their ongoing emotional, mental and physical condition

149.    From approximately January 2012 – September 2013, Uerlings knew and/or suspected that J.M. repeatedly exhibited multiple bruises and marks over his face and his ears, head, neck, and shoulders, his armpits and upper and lower arms, his ribs, both hips, his thighs and buttocks, and his upper and lower legs; bite-marks on his hands, fingers, arms, and evidence of pinching and/or scratch marks, cuts or lacerations along his eyebrows and his ears; and that his hair was falling from his head or was being pulled out from his head, and that he began to eat in a compulsive manner. She also knew that Laib had ignored and/or failed to adequately investigate the reports and acquiesced therein.

150.    Uerlings knew and/or suspected that Casey Miller treated toddlers roughly which Laib had ignored and/or failed to adequately investigate. Uerlings acquiesced in Laib's indifference and chose to accept Melissia Miller's exculpatory statements regarding J.M. and failed to interview Casey Miller.

151.    Uerlings knew and/or suspected that from approximately January 2012 – September 2013, which A.S. exhibited signs and symptoms consistent with abuse and maltreatment which Laib had ignored and/or failed to adequately investigate.

152.    Uerlings knew and/or suspected that A.S. was deteriorating mentally and emotionally in the Miller home; that she had become violent and was engaging in uncontrollable screaming and fits that often occurred just before naptime, and that she stated that she wished she were dead. She also knew that Laib had ignored and/or failed to adequately investigate the reports and acquiesced therein.

153.    Uerlings knew and/or suspected that A.S. was being abused which Laib had ignored and/or failed to investigate. Uerlings acquiesced in Laib's indifference and chose to

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

accept Melissia Miller's exculpatory statements regarding A.S.

154.    Uerlings knew and/or suspected that the Miller home was abusive, unsanitary, unsafe, and not even minimally adequate.

155.    Uerlings nevertheless allowed and/or acquiesced in the subsequent placement of J.M. and A.S. into the Miller home in the summer of 2013 and failed to interview Casey Miller.

156.    In October 2013, Uerlings knew that Casey Miller was arrested for having traumatically inflicted multiple fractures to R.L. in the Miller home and she knew and/or suspected that Melissa Miller's exculpatory "no known injury" statement was insufficient and contrary to R.L.'s diagnoses.

157.    Based on the fact and severity of R.L.'s injuries and the multiple prior reports of abuse and maltreatment of J.M., and A.S., who was also a witness to J.M.'s abuse, Uerlings knew and/or was advised that it was necessary to promptly conduct a medical evaluation and/or child abuse assessment of J.M. and A.S. to determine the extent and nature of their abuse.

158.    On information and belief, Uerlings failed to report child abuse of J.M. and A.S. and failed to refer J.M. and A.S. for a medical evaluation or child abuse assessment, which increased the risk of permanent emotional and psychological injury and damage.

159.    Uerlings acted with deliberate indifference to A.S. and J.M.'s recognized liberty interests and rights and/or departed substantially from accepted professional judgment, practice or standards in one or more of the following ways:

a)   Allowing and/or acquiescing to the subsequent confinement of J.M. into the Miller home (August of 2013);

b)   Failing to protect the safety of J.M.;

c)   Failing to document meaningful face-to-face contacts with J.M.;

d)   Ignoring and/or disregarding reports of abuse and maltreatment of J.M.;

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

e)  Accepting Melissa Miller's exculpatory statements;

f)  Failing to interview Casey Miller regarding J.M.;

g)  Allowing and/or acquiescing to the subsequent confinement of A.S. (August of 2013);

h)  Failing to protect the safety of A.S.;

i)  Failing to document meaningful face-to-face contact with A.S.;

j)  Ignoring and/or disregarding reports of abuse and maltreatment of A.S.;

k)  Accepting and/or deferring to Melissa Miller's exculpatory statements;

l)  Failing to interview Casey Miller regarding A.S.;

m) Failing to refer J.M. and A.S. for medical evaluation and/or child abuse assessment;

n)  Failing to report abuse of J.M. and A.S. as a mandatory reporter.

160.    Uerlings' conduct was a proximate cause of injury and damage to Plaintiffs J.M. and A.S., some or all of which is permanent.

**FIFTH CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights**

**(R.L. – Defendants Mahurin and Does)**

161.    Plaintiff R.L. incorporates by reference paragraphs 1 – 93, 97 – 160, as though fully realleged.

162.    Defendant Mahurin was a caseworker for R.L. in approximately September – October 2013 and beyond. Mahurin had a duty to protect the safety of R.L. in the Miller home, monitor the ongoing substitute care placement needs of the child and determine whether the placement had the ability to provide for R.L.'s safety and meet her physical and emotional needs.

163.    Mahurin's duty included the duty to review then existing DHS records regarding the history of the Miller home, including the multiple prior reports of abuse and maltreatment of J.M. and A.S.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

164.    Mahurin had or assumed a duty to ensure that R.L. received necessary and adequate medical attention, and to ensure the preservation of R.L.'s constitutional and statutory rights, including victim's rights.

165.    On or by approximately June 2013, Mahurin knew and/or suspected that the multiple reports regarding abuse and maltreatment of J.M. and A.S. in the Miller home, the reports that Casey Miller treated toddlers roughly, and the fact that the Miller home was unsanitary, unsafe, and not even minimally adequate, and overfilled, rendered the Millers unfit and the Miller home unacceptable to safely provide foster care to R.L. and her siblings.

166.    Notwithstanding her knowledge, in approximately September 2013, Mahurin confined and/or acquiesced in the confinement of R.L. into the Miller home and avoided interviewing Casey Miller whom she knew and/or suspected was unfit.

167.    At that time, Mahurin knew that R.L. had normal gross motor skills, that she could pull herself to stand and was able to cruise along furniture.

168.    By October 15, 2013, Mahurin knew that R.L.'s condition deteriorated rapidly in the Miller home. She knew that R.L. did not crawl, stand, or walk, that she appeared unusually still and oddly quiet, and that she was not affectionate toward Melissa Miller and *vice versa*. Notwithstanding her knowledge of this alarming decline, Mahurin accepted Melissa Miller's exculpatory statements that R.L. was not a very active child or affectionate child, and she chose to not assess R.L.'s condition.

169.    By October 16, 2013, Mahurin also knew that the Millers told DHS that they were overwhelmed with providing foster care services for the five foster children confined into the home, and that they wanted R.L. and her two siblings removed. Mahurin failed to promptly remove R.L.

170.    Mahurin knew that the Millers reiterated their request to get R.L. and her two

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

siblings out of the home on October 17, and October 18, 2013.

171.    On or by approximately October 20, 2013, Mahurin knew and/or was advised that Casey Miller told police detectives that he was frustrated by the excess number of foster children placed and confined into the Miller home, that he had "mishandled" R.L. on numerous occasions prior to her emergent admission, and that, on the evening of October 19, he had yanked on R.L.'s arm to force her into her sleeper and heard a "loud pop" which "shocked" the infant.

172.    Mahurin knew and/or was advised that Casey Miller had described other instances where he had pushed down on R.L.'s legs to "straighten" them, and that he had "grabbed" R.L.'s wrist to force her to "loosen her grip" on her older sibling's hair.

173.    Mahurin knew and/or was advised that Casey Miller was placed under arrest and, based on the statutory cross-reporting of information with law enforcement, Mahurin was provided with and/or had access to the police reports.

174.    Mahurin knew and/or was advised that Casey Miller had inflicted multiple fractures on R.L. and had therefore traumatized her on multiple prior occasions in the Miller home, and that she was suffering from the effects of one or more of these fractures when Mahurin observed her immobility and demonstrable lack of affection for Melissa Miller.

175.    Mahurin knew and/or was advised that R.L.'s emergent medical providers rejected Melissa Miller's exculpatory "no known injury" statements and that R.L.'s multiple fractures were "suspicious for nonaccidental trauma" and highly suggestive of child abuse.

176.    Mahurin worried that her acquiescence in R.L.'s confinement into the Miller home that she knew and/or suspected was abusive, unsanitary, unsafe and not even minimally adequate, and her deliberate failure to interview Casey Miller constituted deliberate disregard of her duty to protect child safety.

177.    Mahurin knew and/or worried that Casey Miller's abuse of R.L. implicated her

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

conduct in deliberately failing to assess R.L.'s deteriorating bodily condition in the Miller home, failing to promptly remove R. L. from the "overwhelmed" Miller home, and failing to report what she knew and/or had suspected was child abuse of R.L.

178.    Mahurin, along with Defendants Major, Stenerson, Laib, Uerlings, and other Jane or John Doe caseworkers and supervisors recognized that Casey Miller's abuse of R.L. implicated their individual and collective deliberate conduct, including the failure to properly certify/re-certify the Millers, the failure to properly monitor the safety of Plaintiffs and other foster children in the unsanitary and unsafe Miller home, the failure to recognize that Plaintiffs' were being abused, and the failure to maintain appropriate professional boundaries with the Millers.

179.    Consistent with DHS's organizational culture and lack of accountability, Mahurin and Does participated in a cover up.

180.    Mahurin participated in the cover up to protect her own interests and the Millers, and shield DHS from civil liability, unfavorable media exposure, and more public opprobrium.

181.    Mahurin set in motion a plan to conjure or suggest that R.L.'s multiple fractures were not caused by Casey Miller's admitted child abuse; but rather, that they resulted from brittle bones. Mahurin knew that such an alternative diagnosis would mitigate Casey Miller's admissions of "mishandling" of R.L. and delay his criminal prosecution.

182.    Mahurin simultaneously withheld the police reports and diagnoses of traumatic injury from R.L.'s geneticists, so as to cause them to rely on Melissa Miller's exculpatory "no known injury" statement, while also withholding R.L.'s complete medical history and the repeated child abuse reports against the Millers from the district attorney.

183.    By October 24, 2013, Mahurin knew and/or was advised that R.L. was on pain medication but was still experiencing significant pain. Mahurin transported R.L. to see an

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

orthopedist in pursuit of brittle bone disease. At that visit, Mahurin related Melissa Miller's "no known injury" statement and omitted mention of R.L.'s ongoing pain that she knew was untrue. Mahurin chose to not provide the orthopedist with the police reports or relay the information therein. Based on the misinformation, R.L. was referred to the Oregon Health and Sciences University ("OHSU") for unnecessary genetic testing and analysis to rule out apparent *osteogenesis imperfecta*, a rare disorder of the connective tissues associated with abnormal bony fragility.

184.    Mahurin and Does deliberately withheld R.L.'s emergent medical diagnoses and the police reports from the OHSU geneticists in an effort to support their alternative cause theory or defense and protect their own interests, not to defend or protect R.L.

185.    Notwithstanding the lack of the police reports, the OHSU geneticists advised Mahurin and Does that given R.L.'s age (10 months) her multiple fractures were inconsistent with *osteogenesis imperfecta* and that even if that condition were confirmed on genetic testing, it could only have indicated a predisposition to fracture, not exclude a possibility or, in this instance, the fact R.L.'s multiple fractures were traumatically inflicted.

186.    The cover up accomplished eight months of delay and silenced the media.

187.    In approximately June 2014, to move the prosecution forward, the district attorney contacted the OHSU geneticists to inquire into the status of any diagnosis. Upon learning that the geneticists did not have the Casey Miller reports, arrangements were made to provide them to the geneticists. After reviewing these reports, the geneticists confirmed that R.L. did not have brittle bone disease or *osteogenesis imperfecta* and notified DHS.

188.    Notwithstanding her knowledge that in the space of one-month Casey Miller had traumatically inflicted seven fractures in R.L.'s 10-month-old body, Mahurin and Does self-servingly acquiesced in the waiver of R.L.'s victim's rights throughout his prosecution and

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

acquiesced in Casey Miller's light probationary sentence of 36 months, no additional jail time, and the successful completion of an anger management assessment.

189.    Mahurin acted with deliberate indifference to R.L.'s recognized liberty interests and rights and/or departed substantially from accepted professional judgment, practice or standards in one or more of the following ways:

a)      Confining and/or acquiescing in the confinement of R.L. into the Miller home;

b)      Failing to protect R.L.'s safety in the Miller home;

c)      Ignoring and/or failing to adequately investigate R.L.'s condition;

d)      Avoiding an interview with Casey Miller;

e)      Failing to promptly remove R.L. from the Miller home;

f)      Accepting Melissa Miller's exculpatory statements;

g)      Failing to seek medical evaluations for J.M. and A.S. and other foster children in the home;

h)      Failing to report the Millers' child abuse of R.L.;

i)      Participating in the cover up.

190.    Mahurin's conduct was a proximate cause of injury and damage to Plaintiff R.L. some or all of which is permanent.

### SIXTH CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights

### (All Plaintiffs – Defendants Melissa Miller and Casey Miller)

191.    Plaintiffs incorporate by reference paragraphs 1-93, as though fully realleged.

192.    Defendants Melissa Miller and Casey Ray Miller, acting individually and as husband and wife, were certified by DHS under the State plan for the purpose of providing non-relative foster care services. As such, the Millers were state actors and/or acted under color of state law.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

193.    The Millers acted jointly and severally with deliberate indifference to Plaintiffs' recognized liberty interests and rights and/or departed substantially from accepted professional judgment, practice or standards in one or more of the following ways:

a)    Depriving Plaintiffs of their right to bodily integrity;

b)    Depriving Plaintiffs of their right to be protected from bodily harm;

c)    Subjecting Plaintiffs to child abuse;

d)    Failing to report child abuse as mandatory reporters.

194.    The Millers' conduct was a proximate cause of Plaintiffs' injury and damage, some or all of which is permanent.

**SEVENTH CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights**

**(Punitive damages – All Plaintiffs – All Defendants and Does, except DHS)**

195.    Plaintiffs incorporate by reference all prior paragraphs, as though fully realleged.

196.    In connection with Plaintiff's federal claims, all named individual and Does acted with an evil motive or intent and/or have shown a reckless and/or callous disregard or indifference to Plaintiffs' recognized liberty interests and rights, and to those of other children removed and placed into DHS's non-relative foster care program.

197.    Plaintiffs seek punitive damages to punish and deter the defendants in the amount of $75,000,000.

**EIGHTH CLAIM FOR RELIEF:  42 USC §1983 - Deprivation of Civil Rights**

**(Declaratory and Equitable Relief – All Plaintiffs – Defendants DHS, DAS, and Does)**

198.    Plaintiffs incorporate by reference 1 – 194, as though fully realleged.

199.    On information and belief, DHS continues to recruit and certify individuals to serve as non-relative foster care providers that it knows and/or suspects fail to possess or demonstrate the requisite abilities, characteristics, and qualifications, required under DHS's

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

rules, policies, and procedures and the State plan.

200.    DHS knows and/or suspects that rendering such individuals financially dependent on foster care payments to meet household expenses violates DHS rules and the State plan, and that this unlawful conduct creates a substantial risk of serious harm to foster children and perpetuates child abuse.

201.    DHS knows and/or anticipates that certified/recertified financially strapped non-relative foster care providers will readily obey and subserve the agency and its whims and that it can count on its indentured servants to cover for and protect certifiers and caseworkers at the expense of the foster children. DHS also knows, and/or should know based on its audit and litigation history, that indenturing non-relative foster care providers is dangerous and it is contrary to the agency's paramount duty to protect child safety and civil rights.

202.    On information and belief, consistent with its organizational culture and lack of accountability, DHS intends to continue its dangerous practice of recruitment and certification/recertification of other strangers similarly situated to the Millers.

203.    As alleged above, Plaintiffs, who have been removed and re-removed by DHS, remain at risk of future removals by DHS into its dangerous non-relative foster care program. Other similarly situated children who are or will be removed and placed into DHS's non-relative foster care are also subject to a substantial risk of serious harm.

204.    Plaintiffs lack an adequate remedy at law. Unless enjoined, DHS's conduct will cause irreparable injury/damage to Plaintiffs, and DHS will continue to cause and inflict harm on other defenseless, traumatized, and vulnerable children, taken into its custody.

205.    Accordingly, Plaintiffs seek necessary and proper declaratory and/or injunctive relief including the following relief:

a) Declare that DHS's certification/recertification of the Millers was unlawful and

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

enjoin DHS from certifying/recertifying non-relative foster care applicants/providers that lack adequate financial resources to support the operation of the home independent of foster care payments;

b)  Declare that DHS's investigation of R.L.'s abuse was a conflict of interest and enjoin DHS from conducting investigations of child abuse occurring in its foster care program;

c)  Declare that DAS's investigation was a sham and enjoin DAS to objectify and complete its investigation and determine DHS's legal responsibility; and,

d)  Fire individuals that participated in the cover up.

* * *

## II.    STATE CLAIMS

**NINTH CLAIM FOR RELIEF:  Negligence and/or negligence *per se***

**(All Plaintiffs – Defendant DHS)**

206.    Plaintiffs incorporate by reference paragraphs 1-194 as though fully realleged.

207.    DHS is liable for its tortious conduct and it is vicariously liable for the tortious conduct of its officers, employees, and agents acting within the scope of their employment or duties.

208.    Each and every act of physical and/or sexual abuse and/or exposure to physical and sexual abuse and/or each and every act of child abuse of each Plaintiff was a separate occurrence and cause of Plaintiffs' injuries and damages.

209.    DHS had a non-delegable duty to protect Plaintiffs' safety and bodily integrity.

210.    DHS also had a statutory duty to protect Plaintiffs as follows:

a)      To be placed in the least physically restrictive environment that appropriately meets their needs, OAR 413-010-0180(1);

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

b)     To be protected from physical and sexual abuse, emotional abuse, neglect, and exploitation, OAR 413-010-0180(6);

c)     To be provided services designed to reunite the child with his or her parent or legal guardian except when there is clear evidence that the parent or legal guardian may not protect the child's welfare, OAR 413-010-0180(7);

d)     To visit and communicate with a parent or legal guardian, siblings, members of his or her family, OAR 413-010-0180(11);

e)     To be involved, in accordance with his or her age and ability and with the law, in making major decisions that affect his or her life, OAR 413-010-0180(12);

f)     To be placed with a person or family of good standing for care or services, as required by ORS 418.015(3);

211.     DHS was negligent and/or negligent *per se* in one or more of the following particulars:

a)     Certifying and/or recertifying the Millers;

b)     Failing to conduct an adequate assessment of the Millers and their surrounding environment prior to certification, as set forth in OAR 413-120-0420 et seq, OAR 413-200-0308 et seq, and OAR 413-200-0358 et seq.;

c)     Failing to adequately supervise certification of the Millers as set forth in OAR 413-120-0420(c)(8), OAR 413-120-0420(c)(11), OAR 413-120-0457(1) and (2), OAR 413-200-0308(3)(a),OAR 413-200-0308(3)(g), OAR 413-200-0308(3)(h), OAR 413-200-0308(3)(h), OAR 413-200-0308(3)(h), and OAR 4130200-0358(1), and OAR 413-200-0308(3)(f);

d)     Failing to adequately monitor the Miller home, or make and document face-to-face contacts as set forth OAR 413-080-0059(1)(a) and OAR 413-080-0059(1)(c);

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

e)     Disregarding the Millers' lack of adequate financial resources independent of foster care payments and their dependency on foster care payments to maintain household expenses;

f)     Failing to train certifiers, and certifier-supervisors to properly enforce the certification rules and requirements;

g)     Rendering the Millers financially dependent on foster care payments to maintain household expenses;

h)     Confining Plaintiffs into the Miller home;

i)     Failing to adequately supervise Plaintiffs' confinement into the Miller home;

j)     Failing to train certifiers, certification-supervisors, caseworkers, and caseworker-supervisors to timely recognize signs of abuse in infants and toddlers;

k)     Failure to adequately assess child safety in light of reports of child abuse in the Miller home;

l)     Failing to protect Plaintiffs' safety.

212.    DHS's negligence and/or negligence *per se* was a substantial factor in the cause of Plaintiffs' injury and damage, some or all of which may be permanent.

**TENTH CLAIM FOR RELIEF: Violation of ORS 124.100 Abuse of Vulnerable Person**

**(All Plaintiffs – Defendant Casey Miller)**

213.    Plaintiffs incorporate by reference paragraphs 1-93, as though fully realleged.

214.    Plaintiffs were incapacitated persons as defined in ORS 124.100(d) and ORS 125.005(5),(6).

215.    From approximately December 2011 to October 20, 2013, Casey Miller physically abused each Plaintiff within the meaning of ORS 124.105(1)(a),(d),(f) and (h).

41 - COMPLAINT AND DEMAND FOR JURY TRIAL

216.    Each and every act of physical and/or sexual abuse and/or exposure to sexual abuse and/or each and every act of child abuse of each Plaintiff was a separate occurrence and violation of ORS 124.100.

217.    Casey Miller's conduct caused each Plaintiff's injury and damage, some or all of which may be permanent.

218.    Under ORS 124.100(2)(a) and (b). Plaintiffs seek to recover amounts equal to three times their economic and non-economic damages, attorney fees, costs and disbursements, and punitive damages.

**ELEVENTH CLAIM FOR RELIEF: Violation of ORS 124.100 Abuse of Vulnerable Person**

**(J.M., A.S. – Defendants Major, Stenerson, Laib, and Does)**

219.    J.M. and A.S. incorporate by reference paragraphs 1 – 142, 206 – 212, as though fully realleged.

220.    Major, Stenerson, and Laib caused the physical abuse and/or permitted another person to engage in physical abuse of J.M., and knowingly acted and/or failed to act under circumstances in which a reasonable person should have known of the physical abuse. ORS 124.100(2) and (5).

221.    The joint and several conduct of these defendants caused J.M.'s and A.S.'s injuries and damages. Under ORS 124.100(2)(a) and (b), J.M. and A.S. seek to recover amounts equal to three times their respective non-economic and economic damages, attorney fees, costs and disbursements, and punitive damages.

**TWELFTH CLAIM FOR RELIEF: Violation of ORS 124.100 Abuse of Vulnerable Person**

**(J.M., A.S. – Defendants Uerlings and Does)**

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland OR 97201
T: 503.229.1819 | F: 503.229.0630

222.    J.M. and A.S. incorporate by reference paragraphs 1-160, 206-212, as though fully realleged.

223.    Uerlings and Does caused the physical abuse and/or permitted another person to engage in acts of physical abuse of J.M. and A.S., and knowingly acted and/or failed to act under circumstances in which a reasonable person should have known of the physical abuse under ORS 124.100(2) and (5).

224.    The joint and several conduct of these defendants caused J.M. and A.S.'s injury and damage. Under ORS 124.100(2)(a) and (b), A.S. seeks to recover amounts equal to three times her non-economic and economic damages, attorney fees, costs and disbursements, and punitive damages.

**THIRTEENTH CLAIM FOR RELIEF: Violation of ORS 124.100 Abuse of Vulnerable Person**

**(R.L. – Defendants Mahurin and Does)**

225.    R.L. incorporates by reference paragraphs 1 – 190, 206-212, as though fully realleged.

226.    Mahurin and Does, caused the physical abuse and/or permitted another person to engage in acts of physical abuse and neglect of R.L. and knowingly acted and/or failed to act under circumstances in which a reasonable person should have known of the physical abuse and neglect under ORS 124.100(2) and (5).

227.    The conduct of these defendants jointly and severally caused R.L.'s injury and damage. Under ORS 124.100(2)(a) and (b), R.L. seeks to recover amounts equal to three times her non-economic and economic damages, attorney fees, costs and disbursements, and punitive damages.

**FOURTEENTH CLAIM FOR RELIEF: Sexual Abuse (Sexual Battery)**

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

**(A.S. – Defendant Casey Miller)**

228.    A.S. incorporates by reference paragraphs 1-93, 118-120, as though fully realleged.

229.    On numerous occasions between December 23, 2011 and October 19, 2013, Casey Miller sexually abused and battered A.S.

230.    Each and every act of physical and/or sexual abuse and/or exposure to sexual abuse of A.S. was a separate and/or continuing tort.

231.    Casey Miller's conduct caused A.S.'s injury and damage.

232.    For each battery, A.S. seeks non-economic damages, and economic damages in an amount to be proven at the time of trial, and punitive damages.

**FIFTEENTH CLAIM FOR RELIEF: Negligence and/or negligence *per se***

**(All Plaintiffs – Defendant Melissa Miller)**

233.    Plaintiffs incorporate by reference paragraphs 1-93, as though fully realleged.

234.    Melissa Miller was negligent and/or negligent *per se* in one of more of the following particulars:

a)  Failing to exercise judgment and demonstrate responsible, stable and emotionally mature behavior as set forth in OAR 413-200-0308(3)(a);

b)  Failing to maintain conditions in the home that provided for the safety, health and well-being of Plaintiffs, as set forth in OAR 413-200-0308(3)(c);

c)  Failing to protect Plaintiffs from abuse as set forth in OAR 413-010-0180(5);

d)  Failing to supervise Casey Miller;

e)  Failing to report child abuse as a mandatory reporter.

236.    Melissa Miller's negligence and/or negligence *per se* was a substantial factor in the cause of each Plaintiff's injury and damage, some or all of which may be permanent.

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

\* \* \*

## PRAYER

Plaintiffs pray for judgment and relief in their favor and against defendants as follows:

1. On the First Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,** asserted against Defendants Major and Does, Plaintiffs seek non-economic damages as follows: J.M., $2,500,000; A.S., $15,000,000; R.L., $7,500,000. Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

2. On the Second Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,** asserted against Defendants Stenerson and Does, Plaintiffs seek non-economic damages as follows: J.M., $2,500,000; A.S., $15,000,000; R.L., $7,500,000. Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

3. On the Third Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,** asserted against Defendants Laib and Does, J.M. seeks non-economic damages in the amount of $2,500,000; A.S. seeks non-economic damages in the amount of $15,000,000. These Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

4. On the Fourth Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,** asserted against Defendants Uerlings and Does, J.M. seeks non-economic damages in the amount of $2,500,000; A.S. seeks non-economic damages in the amount of $15,000,000. These Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

5. On the Fifth Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,**

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

asserted against Defendants Mahurin and Does, R.L. seeks non-economic damages in the amount of $7,500,000. She seeks economic damages to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

6.      On the Sixth Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,** asserted against Defendants Melissa Miller and Casey Miller, Plaintiffs seek non-economic damages as follows: J.M., $2,500,000; A.S., $15,000,000; R.L., $7,500,000. Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

7.      On the Seventh Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,** asserted against all Defendants, except DHS, and Does, Plaintiffs seek punitive damages on their federal claims in the amount of $75,000,000.

8.      On the Eighth Claim for Relief: **42 USC §1983 – Deprivation of Civil Rights,** asserted against Defendants DHS, DAS, and Does, Plaintiffs seek declaratory and/or equitable relief in the manner alleged and as the Court may decree.

9.      On the Ninth Claim for Relief: **Negligence and/or negligence *per se*,** asserted against Defendant DHS, Plaintiffs seek non-economic damages as follows: J.M., $2,500,000; A.S., $15,000,000; R.L., $7,500,000. Plaintiffs also seek economic damages in an amount to be proven at the time of trial, costs and disbursements.

10.     On the Tenth Claim for Relief: **Violation of ORS 124.100 Abuse of Vulnerable Person,** asserted against Defendant Casey Miller, Plaintiffs seek an award of three times their non-economic damages, and economic damages to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

11.     On the Eleventh Claim for Relief: **Violation of ORS 124.100 Abuse of Vulnerable Person,** asserted against Defendants Major, Stenerson, Laib and Does, Plaintiffs

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland, OR 97201
T: 503.229.1819 | F: 503.229.0630

J.M. and A.S. seek an award of three times their non-economic damages, and economic damages to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

12.    On the Twelfth Claim for Relief: **Violation of ORS 124.100 Abuse of Vulnerable Person,** asserted against Defendants Uerlings and Does, Plaintiffs J.M. and A.S. seek an award of three times her non-economic damages, and economic damages to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

13.    On the Thirteenth Claim for Relief: **Violation of ORS 124.100 Abuse of Vulnerable Person,** asserted against Defendants Mahurin and Does, Plaintiff R.L. seeks an award of three times her non-economic damages, and economic damages to be proven at the time of trial, attorney fees, costs and disbursements, and punitive damages.

14.    On the Fourteenth Claim for Relief: **Sexual Abuse (Sexual Battery),** asserted against Defendant Casey Miller, Plaintiffs seek non-economic damages as follows: J.M., $2,500,000; A.S., $15,000,000; R.L., $7,500,000. Plaintiffs seek economic damages in an amount to be proven at the time of trial, attorney fees, costs and disbursements, and an award of punitive damages.

15.    On the Fifteenth  Claim for Relief: **Negligence and/or negligence *per se*,** asserted against Defendant Melissa Miller, Plaintiffs seek non-economic damages as follows: J.M., $2,500,000; A.S., $15,000,000; R.L., $7,500,000. Plaintiffs seek economic damages in an amount to be proven at the time of trial, and attorney fees, costs and disbursements.

Plaintiffs seek further necessary or proper relief as the Court may deem equitable and just.

Dated: April 27, 2018.

RIZZO MATTINGLY BOSWORTH PC


By: s/*Steven Rizzo*
Steven Rizzo

RIZZO MATTINGLY BOSWORTH PC
1300 SW Sixth Avenue
Suite 330
Portland  OR 97201
T: 503.229.1819 | F: 503.229.0630

Mary D. Skjelset
Rizzo Mattingly Bosworth PC
1300 SW Sixth Avenue, Suite 330
Portland, OR 97201
Tel: (503) 229-1819
Fax: (503) 229-0630
ATTORNEYS FOR PLAINTIFFS

48 - COMPLAINT AND DEMAND FOR JURY TRIAL